UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

YOUNG BOK SONG,                )
                              )
        v.                    )        No. 3:11-cv-1082
                              )
JOHNNY FITZ[1]                 )
        Warden                )


**To: Honorable Waverly D. Crenshaw, Jr., Chief District Judge**


## REPORT AND RECOMMENDATION

The above-captioned petition for a writ of habeas corpus filed under 28 U.S.C. § 2254 was referred to the Magistrate Judge for further proceedings under Rule 8(b) of the Habeas Corpus Rules, 28 U.S.C. § 636(b)(1)(B), and Rule 72.03 of the Local Rules of Court. *See* Order entered May 14, 2012 (Docket Entry No. 36).

For the reasons set out below, the undersigned respectfully recommends that the petition be denied and this action be dismissed.[2]

## I. BACKGROUND

Young Bok Song ("Petitioner") is an inmate of the Tennessee Department of Correction ("TDOC") currently confined at the West Tennessee State Penitentiary in Henning, Tennessee. In 2004, a jury in Davidson County, Tennessee convicted him of seven counts of rape of a child and four counts of aggravated sexual battery after hearing evidence of crimes committed against two female minors who were the daughters of a woman with whom Petitioner was romantically

---

[1] Johnny Fitz, the current warden at the West Tennessee State Penitentiary, is hereby substituted as the respondent in this habeas corpus case.

[2] Although Petitioner requests an evidentiary hearing, the Court finds the issues are resolvable from the parties' filings.

involved and at whose home he sometimes lived. For these crimes, he received an effective sentence of 65 years imprisonment to be served at 100 percent. *See State v. Young Bok Song*, 2005 WL 2978972 (Tenn. Crim. App. Nov. 4, 2005), *perm. app. denied* (Tenn. March 27, 2006).

Petitioner asserted his innocence and testified at his trial in rebuttal to the victims' testimony that he had sexually abused them. There were no witnesses to the crimes and no physical evidence that directly implicated Petitioner, although forensic evidence from a physical examination of one of the victims was introduced that was consistent with sexual abuse and other witnesses testified to statements made to them by the victims about being sexually abused. The facts of the case, as summarized by the Tennessee Court of Criminal Appeals in its opinion from Petitioner's direct appeal, *State v. Young Bok Song*, 2005 WL 2978972 (Tenn. Crim. App. Nov. 4, 2005) ("*Song Direct Appeal*"), are as follows:

> The victim, S.L., born on September 8, 1989, and fourteen years old at the time of the trial, testified that she lived with her mother, Chong Suk Pak, and her younger sister, victim J.L., in a two-bedroom apartment in Nashville during the times the defendant had sexual contact with her. She testified that she did not know or have any memories of her biological father. S.L. said she met the defendant when she was very young and remembered him living with her family "for a little bit." After the defendant moved out to live with his ex-wife and children, S.L. visited him at his house a "couple of times a week," but also continued to see the defendant at her apartment because he often babysat S.L and J.L. while their mother was at work.
>
> S.L. testified to a number of different sexual encounters with the defendant. S.L. said the first time she remembered the defendant having sexual contact with her was when she was about eight years old and her mother was at work. She said she was in her bedroom practicing her flute and her sister was in the living room when the defendant came into the room and "told [her] to take off [her] clothes." After taking off all her clothes, S.L. closed her eyes at the direction of the defendant and laid down on her back on the bed while his "penis went inside [her] vagina." S.L. said this hurt and she began to cry, but the defendant "told [her] to be quiet." S.L. said that "[a]fter [the defendant] finished, [he] told [her] to go wash [herself]," which she did. She said she did not yell for her sister because she was afraid of the defendant. S.L. could not remember how many times the defendant had raped her in her bedroom but said it happened more than twice.
>
> The second incident occurred when S.L. was again in her bedroom practicing her flute and the defendant told her sister and his own daughter, Mindy, to go outside and play. S.L. did

not remember how old she was at the time of this encounter. She said the defendant came into her room and told her to take off her clothes and then "put his penis into [her] vagina" while she was lying on her bed. She did not recall how long this episode lasted, nor did she remember if the defendant said anything.

The third sexual encounter occurred in her living room while S.L.'s mother was at work and her sister was asleep in the bedroom. She said the defendant told her to take off her clothes, and he then "[p]ut his penis inside [her] vagina" while she laid on the floor on her back. Asked if she ever said anything to the defendant when he told her to remove her clothes, S.L. said she "sometimes ... said that [she] didn't want to do it," but he "still did it." S.L. said she felt pain during the rape and cried, but the defendant told her to be quiet. Asked how she knew her mother was at work, S.L. said that the defendant called her mother "before ... to make sure that she was still there." S.L. said she had her eyes closed the entire time and did not know if the defendant had anything on his penis while he was raping her. S.L. could not remember how many times the defendant raped her in the living room but said it was more than once.

The fourth sexual encounter happened when S.L. was twelve years old and the defendant told her to go to her mother's bedroom. S.L. said the defendant "had a towel and he put it behind [S.L's] butt, and he told [her] to take off [her] clothes and stuff." The defendant then "put his penis inside [S.L's] vagina," which was "painful" and "made [her] bleed." Asked if the defendant did anything different compared to the other times he raped her, S.L. explained that "he did it more harder." Afterward, the defendant picked S.L. up and took her into the bathroom, put her in the bathtub, and told her to wash herself. S.L. said she continued to bleed the next day at school and used tissue to keep the blood from going anywhere. S.L. testified that this was the last time the defendant put his penis inside her vagina.

The fifth encounter S.L. recalled having with the defendant was at his house. She said he told her to take off her clothes and "help him scrub his back in the shower." S.L. could not remember what happened after she took off her clothes. The sixth encounter with the defendant occurred in the living room of S.L.'s apartment when the defendant, lying on the floor, told S.L. to "perform oral sex." S.L. said the defendant put "[h]is penis inside [her] mouth," and she "was sort of choking" because the defendant "was making [her] gag" as his penis "was going really deep" in her mouth. Afterwards, the defendant told S.L. to brush her teeth. S.L. testified that the defendant made her perform oral sex on him again in her bathroom while her mother, sister, and cousin were all home. She said he turned on the faucet and made her get on her knees and put his penis in her mouth. S.L. said the defendant made her gag because "[h]e was kind of pushing [his penis] really deep down in [her] throat or something."

In addition to these sexual encounters, S.L. described incidents when the defendant touched her breasts and buttocks. She explained that he squeezed her breasts and buttocks under her clothes on other occasions separate from the ones earlier described. S.L. said the defendant told her while squeezing her breasts that she "should be thanking him because it was making [her breasts] grow."

S.L. testified that the first person she talked to about what the defendant did to her was a friend at school. She said she told her friend after attending a school program that dealt with rape and hearing from a girl "talking about how she got raped." The friend told her teacher, Ms. Griffith, whom S.L. later talked to about the sexual encounters. S.L. said she did not tell anyone what happened to her before this because she was afraid of the defendant as a result of his hitting her and J.L. when they did not listen to their mother or do their school work. She explained that it was the defendant, not her mother, who disciplined her.

J.L., born October 31, 1990 and thirteen years old at the time of trial, testified that she did not remember how old she was when she first met the defendant but thought she was either in the first or second grade. She said she went to the defendant's house once or twice a month, and the defendant visited or babysat her and S.L. at their apartment while their mother worked. Asked if S.L. ever told her what happened with the defendant, J.L. said S.L. told her that he "raped" her in the living room. J.L. later told their mother what happened, and she "almost fainted." Asked if anything happened between her and the defendant, J.L. said when she was twelve he touched and squeezed her breast while she was in the bathroom of her apartment. She said the touching lasted a couple of seconds and made her a "little nervous." J.L. told S.L. about what had happened after S.L. confided in J.L. about what the defendant had done to her.

J.L. testified that the defendant disciplined her and S.L. and was more strict with them than their mother. She explained that he would strike them on the hands or the back of their legs with a metal stick. She said she never told her mother about the defendant hitting her because she was scared.

The victims' mother, Chong Suk Pak, who moved to the United States from Korea in 1985, testified through an interpreter. She divorced the victims' father in 1994 and he moved back to Korea sometime after that. Pak met the defendant in 1994 and he lived with her and the victims from May 1994 until March 1995, sleeping in her bedroom while she slept on the couch. Pak acknowledged having a romantic relationship with the defendant and said she did not know he had an ex-wife and children in Korea until after he began living with her. She said he told her that he was divorced. After the defendant's ex-wife and children moved to the United States in 1995, he lived with them but continued to come to Pak's apartment to babysit the victims. Pak acknowledged she continued her romantic relationship with the defendant until he moved to Alabama in 2002.

Pak said she allowed the defendant to babysit her children because she did not "trust anybody else, anyone else, to have her children's well-being." She "could not trust her ex-husband, but she trusted the defendant" with her children. Asked why she did not trust her ex-husband with the girls, Pak testified that "he often mentioned about sexual abuse of a father of their children; and, so, I just thought he ... could not be trusted." She later explained that her ex-husband "watched TV and read ... newspaper article about sexual abuse by parents, he ... mentioned about those. So, when I heard him mentioning that, I began to doubt." She acknowledged that she did not know if her ex-husband had ever

abused her children and the last time he saw the children was in 1993, when S.L. was four years old.

Pak testified that the defendant helped S.L. and J.L. with their homework and taught them music. Asked if she had seen the defendant strike her children, Pak answered that he "frequently" did so and described an incident when the defendant hit S.L. on the back of her leg with a stick. She acknowledged that striking children with a stick on their feet or back of their legs is typical punishment in Korea. Asked if she had ever questioned her daughters as to whether anything had happened to them while they were at the defendant's home, Pak answered, "I ask them if he didn't do anything. I ask that, because he is not their real father." She testified that S.L. never told her about the defendant's abuse, that she learned about it from J.L., and that the news was a shock to her. Pak acknowledged that, after the defendant moved away, she often told her daughters that if they did not behave he would come back to discipline them.

Brenda Griffith, a teacher at John Trotwood Moore Middle School, testified that in May 2003, her class had just finished sex education classes. She said representatives from Mercy Ministries talked to the class and acknowledged one of the speakers was a young girl who talked about being sexually abused but had not described the abuse in graphic detail. About a week later, representatives from the Rape and Sexual Abuse Center came to talk to her class, and soon after their presentation, S.L. told Griffith she had "been raped on numerous occasions, by a friend of her mother's." Griffith said S.L. seemed "very agitated and very nervous" and "upset" at the time.

Dr. Angela Latrice McShepard Carr, a former guidance counselor at John Trotwood Moore Middle School, testified that Ms. Griffith reported S.L.'s abuse to her and that she spoke with S.L. about what had happened with the defendant. On cross-examination, Dr. Carr could not recall if S.L. used the word "raped" when she talked to her. She acknowledged that S.L. did not describe the abuse in detail.

Dr. Maureen Sanger, a psychologist with Our Kids Center in Nashville, testified that she interviewed S.L. in June 2003 at the Center, which performs medical evaluations of children suspected of being victims of sexual abuse. The interview included S.L.'s medical history, which Dr. Sanger read to the jury. S.L. told Dr. Sanger that no one other than the defendant had ever touched her sexually, and she denied ever having any "peer sexual contact." On cross-examination, Dr. Sanger acknowledged that "Young children oftentimes don't have clear memories that they're able to report verbally."

Carolyn Smeltzer, a nurse practitioner at Our Kids Center, testified that she performed a physical examination on S.L. Smeltzer explained that S.L. "had basically two areas on her hymen that ... lacked any hymenal tissue" which "had to have been caused by some sort of a penetrating trauma, ... something penetrated through her hymen and tore her hymen in both of those spots, all the way down to the base." Asked what could cause such an injury, Nurse Smeltzer said, "When we see kids with injuries to their hymen, that are talking about sexual abuse, they're typically talking about penile penetration to their ... vaginal or genital area." Smeltzer acknowledged that such injuries can be the result of "an accidental

penetrating injury, like a ... straddle injury." Nurse Smeltzer testified that there is a difference in the depth of a child's hymen and explained that S.L.'s was "difficult to examine ... because of the depth of her hymen; it was fairly in-deep inside." Smeltzer said the injury to S.L.'s hymen would have taken approximately one week to heal, and she could not say when the injury took place. Asked if the injury could have taken place when S.L. was four or younger, Smeltzer said, "There's no way to be absolutely certain, but this is not-the pattern of injury is not something that we commonly see in a young child." She further explained that when a younger child is sexually penetrated, "it's typically a fairly large injury ... the children really come out with almost no hymenal tissue in a good part of the posterior pole."

Edward Stotts, a case manager for the Department of Children's Services ("DCS"), investigated S.L.'s allegation of sexual abuse by the defendant. Stotts told S.L. that she would be going to the Child Advocacy Center for a forensic interview and explained that a forensic interview is "basically an interview that's conducted for legal purposes." Stotts said that S.L.'s forensic interview was tape-recorded. Stotts did not participate in S.L.'s interview but did interview J.L. who told him that the defendant had touched her breast. He said no medical examination was performed on J.L. because "there wasn't a disclosure of any type of penetration" with her.

On cross-examination, Stotts acknowledged setting up the forensic interview for S.L. after she told him she had been raped, but without receiving any details about the actual abuse. Regarding the taped forensic interview, Stotts acknowledged that S.L. was not admonished to tell the truth but did not know why.

Detective Brett Gipson, with the Metro-Nashville Police Department Sex Crimes Unit, testified that he talked to S.L. "one or two times" but did not talk to J.L. because the DCS conducted the interviewing at the Child Advocacy Center. He said the defendant was eventually located in North Carolina where he was arrested.

Mindy Song, the defendant's daughter and twelve years old at the time of trial, testified that she had visited the victims' apartment but could not recall the defendant ever telling her and J.L. to play outside by themselves. She said she was sure about this because the defendant kept a very close eye on her to make sure she stayed safe.

The defendant testified that he came to the United States from Korea in December 1994, leaving behind his pregnant ex-wife and daughter. He said he met the victims' mother in Nashville and began living with her, acknowledging they were "lovers." He described his relationship with S.L. and J.L. as an "uncle" or "father" and said the victims' mother asked him to be the disciplinarian of the girls. He acknowledged the victims were afraid of him because he "had to use some corporal punishment and sometimes cry out, I'm yelling; sometimes give them some angry eyes," but when he was not disciplining them, they "were very close ... just a father and daughters." The defendant denied sexually abusing S.L. and J.L. and maintained that the victims had lied, explaining, "If I do one sex with the children, her inside vagina will tore down."

*Song Direct Appeal* at *1-5.

## II. STATE COURT PROCEEDINGS

Plaintiff filed a timely direct appeal from his convictions. In his direct appeal, Petitioner raised four issues of trial court error: (1) the trial court erred by denying his motion to appoint a Korean interpreter, which he contends was necessary because of his inability to intelligently express himself in English; (2) the trial court erred by denying his motion to compel the State to provide him with a copy of the taped forensic interview of one of the two child victims conducted by the Child Advocacy Center; (3) the trial court erred by allowing the State to ask him numerous argumentative questions; and, (4) the trial court erred by denying his motion for a new trial based on newly discovered evidence, which consisted of a 1993 order of protection filed by the victims' mother against their biological father. *See Song Direct Appeal*. The Tennessee Court of Criminal Appeals found no merit in any of these issues and affirmed Petitioner's convictions and sentence. *Id*. The Tennessee Supreme Court denied Petitioner's application for permission to appeal on March 27, 2006. *See* Docket Entry No. 26-18.

Petitioner thereafter filed a timely *pro se* petition for post-conviction relief in the Davidson County Criminal Court. *See* Docket Entry No. 26-19 at 21-110. Petitioner was appointed counsel and filed an amended petition, raising additional claims of ineffective assistance of trial counsel. *See* Docket Entry No. 26-20 at 6-10. After an evidentiary hearing at which Petitioner and his trial counsel testified, the state court denied Petitioner's request for post-conviction relief. *See* Docket Entry No. 26-20 at 93-105.

Upon appeal from the denial of relief, Petitioner raised the following claims that his trial counsel rendered effective assistance of counsel during his defense: (1) counsel failed to object to the inadmissible hearsay testimony of Brenda Griffith, Dr. Angela Carr, Dr. Maureen Sanger, and

Edward Stotts; (2) counsel failed to present an alibi defense or to request that the trial court instruct the jury on alibi; (3) counsel failed to retain an interpreter; (4) counsel failed to timely communicate the State's plea offer; (5) counsel failed to request a jury instruction on child abuse as a lesser-included offense of child rape; and, (6) counsel failed to move to sever the offenses involving the older child from those involving her younger sister. On March 4, 2008, the Tennessee Court of Criminal Appeals affirmed the denial of relief, finding that Petitioner had not met his burden of showing that he received ineffective assistance of counsel. *Song v. State*, 2008 WL 624926 (Tenn. Crim. App. Mar. 4, 2008) ("*Song PCR Opinion*"). Petitioner's application for permission to appeal to the Tennessee Supreme Court was denied on September 29, 2008. *Id.*

Petitioner thereafter unsuccessfully pursued petitions in the Tennessee courts for coram nobis relief, *see Young Bok Song v. State*, 2010 WL 4296673 (Tenn. Crim. App., Oct. 29, 2010), and *Young Bok Song v. State*, 2011 WL 2713738 (Tenn. Crim. App., July 13, 2011), and for habeas corpus relief. *See Young Bok Song v. Carlton*, 2011 WL 900059 (Tenn. Crim. App. Mar. 16, 2011).[3]

### III. PROCEDURAL BACKGROUND

After failing to obtain relief in the state courts, Petitioner filed a *pro se* habeas corpus petition in this Court on November 7, 2011, raising sixteen grounds for relief, including trial court

---

[3] In his first coram nobis petition, Petitioner unsuccessfully argued that he was entitled to relief based upon newly discovered evidence concerning the age of one of the victims at the time of some of the crimes for which he was convicted. *Young Bok Song v. State*, 2010 WL 4296673 at *7-8. In his second coram nobis petition, the state court denied relief, finding that Petitioner did not raise any claims that involved newly discovered evidence or that had not already been addressed in his direct appeal or his post-conviction relief petition. *Young Bok Song v. State*, 2011 WL 2713738 at *3. In his state habeas corpus petition, Petitioner asserted that his "holding authorities" had denied his request to contact the Korean Consulate General in violation of Article 36 of the Vienna Treaty. The Tennessee Court of Criminal Appeals upheld the dismissal the petition because Petitioner's allegation, even if true, did not raise a cognizable claim for state habeas corpus relief. *Young Bok Song v. Carlton*, 2011 WL 900059 at *2.

error and ineffective assistance of trial counsel. *See* Petition (Docket Entry No. 1). Respondent filed an answer that was accompanied by a substantial state technical record. *See* Notice of Filing Documents (Docket Entry Nos. 26 and 27). Petitioner was subsequently appointed counsel and filed a first amended petition (Docket Entry No. 43). Because it was unclear whether claims from the *pro se* petition were incorporated into the amended petition, Petitioner was directed by the Court to file a second amended petition, which was filed on December 10, 2014. *See* Second Amended Petition (Docket Entry No. 72).

Upon his motions, Petitioner was allowed time for limited discovery to subpoena the audiotape of his trial testimony and the matter was stayed from November 2014 to October 2, 2017, while he pursued another petition for a writ of error coram nobis in state court that was based upon new evidence of an expert language evaluation report that he obtained to support his claim that trial counsel was ineffective for failing to secure an interpreter at trial. *See* Order entered November 5, 2014 (Docket Entry No. 69).

Petitioner's pursuit of state court relief was not successful, *see Young Bok Song v. State*, 2017 WL 2192083 (Tenn. Crim. App. May 17, 2017),[4] and the stay was lifted. Upon the stay being lifted, Respondent filed its answer to the Second Amended Petition. *See* Answer (Docket Entry No. 111). Petitioner thereafter filed a notice of filing two exhibits into the record - (1) a Letter from the Korean Consulate, dated August 24, 2009, stating that it had not been contacted about Petitioner's criminal case at the time it was occurring but would have provided, if requested, a language interpreter, and (2) a language evaluation and assessment report created by Dr. Christine

---

[4] The state appellate court affirmed the lower court's denial of coram nobis relief and the lower court's finding that the petition was filed outside the statute of limitations and that due process did not require tolling of the limitations period because the linguistics expert's findings did not constitute "evidence of innocence" or "newly discovered evidence."

Rhee in August 2015 after she had conducted an oral proficiency interview of Petitioner in 2014 and after she had reviewed Petitioner's trial transcript and the audio recording of his trial testimony. *See* Notice of Filing (Docket Entry No. 116). Petitioner then filed a reply (Docket Entry No. 118), setting out his legal arguments in support of habeas relief. Petitioner's request to hold an evidentiary hearing was denied. *See* Order entered September 27, 2018 (Docket Entry No. 122).

## IV.  SECOND AMENDED PETITION AND RESPONSE

Petitioner raises seven claims for federal habeas relief. His claim of ineffective assistance of counsel has twelve, specific sub-claims. The claims for relief and Respondent's answer are summarized as:

Claim 1 – Petitioner asserts that the trial court violated his constitutional rights by denying his motion for an interpreter. *See* Second Amended Petition at 6-7. Respondent argues the claim is not cognizable on federal habeas review because the United States Supreme Court has never recognized a constitutional right to a court-appointed interpreter. *See* Answer at 6-10. Alternatively, Respondent argues that the state court's denial of this claim was not contrary to, or an unreasonable application of, clearly established federal law, or was not based upon an unreasonable determination of the facts in light of the evidence that was before the state court. *Id.*

Claim 2 – Petitioner asserts that his trial counsel provided constitutionally ineffective assistance of counsel in defending Petitioner from the criminal charges and sets out twelve specific allegations of how counsel was ineffective. *See* Second Amended Petition at 8-10. One of these sub-claims also involves the assertion that Petitioner's appellate counsel was constitutionally ineffective. The specific allegations are as follows:

[1] Trial counsel failed to adequately investigate the victims' family, including, but not limited to, prior allegations by the victims and/or their mother and a history of abuse and/or threats by the victims' biological father. Respondent argues that this sub-claim is procedurally defaulted. *See* Answer at 10-12.

[2] Trial counsel failed to investigate and present an alibi that Petitioner had already moved out of the victims' home and was living and present in Alabama at the time one or more of the charged offenses allegedly occurred. Respondent argues that the state court's denial of this sub-claim was not contrary to, or an unreasonable application of, clearly established federal law. *See* Answer at 12-15.

[3] Trial counsel failed to request a proper jury instruction regarding alibi witnesses and/or alibi evidence. Respondent argues that the state court's denial of this sub-claim was not contrary to, or an unreasonable application of, clearly established federal law. *See* Answer at 15-16.

[4] Trial counsel failed to object to hearsay testimony – and even elicited hearsay testimony himself – from prosecution witnesses, including, but not limited to, Brenda Griffith, Dr. Angela Carr, Dr. Maureen Sanger, Edward Stotts, and/or representatives of the Department of Children's Services. Respondent argues that the state court's denial of this sub-claim was not contrary to, or an unreasonable application of, clearly established federal law. *See* Answer at 17-18.

[5] Trial counsel failed to (a) timely and thoroughly convey all plea offers to Petitioner, (b) adequately explain the elements of the possible offenses of conviction, (c) adequately explain how the State's evidence bore on those elements, (d) advise him appropriately of the likelihood of conviction, (e) adequately explain his sentencing

exposure if convicted, and/or (f) properly advise him whether to accept the State's plea offer(s). Respondent argues that the state court's rejection of this sub-claim was not contrary to, or an unreasonable application of, clearly established federal law. *See* Answer at 18-20.

[6] Trial counsel failed to request a jury instruction on child abuse as a lesser-included offense of child rape. Respondent argues that the state court's denial of this sub-claim was not contrary to, or an unreasonable application of, clearly established federal law. *See* Answer at 21-22.

[7] Trial counsel failed to move to sever counts involving the first victim from counts involving the second victim. Respondent argues that the state court's denial of this sub-claim was not contrary to, or an unreasonable application of, clearly established federal law. *See* Answer at 22-23.

[8] Trial counsel failed to challenge the conviction of aggravated sexual battery (a lesser included offense of rape) on Count 10 as violative of double jeopardy because the State's election of offenses stated that Count 10 was based upon one of the acts of rape charged in Counts 1 through 7, of which Petitioner was also convicted. Respondent argues that this sub-claim is barred by procedural default because it was not fully raised in his state court proceedings. *See* Answer at 23-25.

[9] Trial counsel failed to move to quash Counts 1 through 7 on the grounds that the charges were identical, duplicitous, did not provide specific notice of the charges, and did not protect against double jeopardy. Respondent argues that this sub-claim is both untimely and barred by procedural default. *See* Answer at 25-29.

[10] Trial counsel failed to challenge the State's failure to notify the Korean Consulate of Petitioner's arrest, indictment, detention, and imprisonment, despite Petitioner's request that counsel do so. Respondent argues that this sub-claim is procedurally defaulted. *See* Answer at 29-30.

[11] Trial counsel failed to adequately assess Petitioner's English language proficiency, to make an informed determination of the need for an interpreter, to support a motion for an interpreter with an argument and/or evidence of Petitioner's actual level of proficiency, or to otherwise secure or retain an interpreter to assist in counsel's communication with Petitioner before and during trial, to translate the entire trial proceedings for Petitioner, and to provide translation during Petitioner's own trial testimony. Respondent argues that the state court's rejection of this sub-claim was not contrary to, or an unreasonable application of, clearly established federal law. *See* Answer at 30-32.

[12] Lastly, both trial and appellate counsel failed to challenge Petitioner's sentence, pursuant to *Blakely v. Washington*, 542 U.S. 296 (2004), as being wrongfully enhanced by the trial court based on facts (i.e., an abuse of trust) neither admitted by him nor found by a jury. Respondent argues that this sub-claim is both untimely and procedurally defaulted. *See* Answer at 32-34.

<u>Claim 3</u> – Petitioner asserts that the trial court erred by enhancing his sentence based on facts not admitted by him or found by a jury, in violation of the Sixth Amendment as construed by *Blakely v. Washington*, 542 U.S. 296 (2004). *See* Second Amended Petition at 10. Respondent argues that this claim is both untimely and procedurally defaulted. *See* Answer at 34-35.

Claim 4 – Petitioner asserts that the State "failed to contact the Korean Consulate General in Atlanta, Georgia, upon the request of Mr. Song, in violation of Article 36(1)(b) of the Vienna Convention." *See* Second Amended Petition at 10-11. Respondent argues that this allegation fails to state a cognizable claim. *See* Answer at 35-37.

Claim 5 – Petitioner asserts that the trial court erred by denying Petitioner's motion to compel production of the forensic interview tape of the primary victim. *See* Second Amended Petition at 11. Respondent argues that this claim is procedurally defaulted. *See* Answer at 37-39.

Claim 6 – Petitioner asserts that trial court erred in allowing inappropriate questioning of Petitioner by the prosecutor. *See* Second Amended Petition at 11-12. Respondent argues that this claim is procedurally defaulted or, alternatively, that the state court's denial of this claim was not contrary to, or an unreasonable application of, clearly established federal law. *See* Answer at 39-43.

Claim 7 – Petitioner asserts that the trial court erred when it convicted him and/or denied his motion for a new trial despite newly discovered evidence, a 1993 order of protection filed by the victims' mother against their biological father, which Petitioner contends established reasonable doubt of his guilt and/or showed his actual innocence. *See* Second Amended Petition at 12. Respondent argues that this claim fails to state a cognizable claim for federal habeas relief. *See* Answer at 43-45.

## V. STANDARDS FOR HABEAS CORPUS REVIEW

The petition in this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (internal citations and quotation marks omitted). As the

Supreme Court explained, the AEDPA "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). The AEDPA, therefore, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Id*.

One of the AEDPA's most significant limitations on the federal courts' authority to issue writs of habeas corpus is found in 28 U.S .C. § 2254(d). Under the AEDPA, the court may grant a writ of habeas corpus on a claim that was adjudicated on the merits in state court if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Under Section 2254(d)(1), a state court's decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases or if the state court confronts a set of facts that are materially indistinguishable from a decision [of the Supreme Court] and nevertheless arrives at a [different result]." *Hill v. Curtin*, 792 F.3d 670, 676 (6th Cir. 2015) (*en banc*) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)) (cleaned up). "Under the unreasonable application clause of [Section] 2254(d)(1), habeas relief is available if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. (quoting *Harris v. Haeberlin*, 526 F.3d 903, 909 (6th Cir. 2008)) (cleaned up). A state court's application is not unreasonable under this standard simply because a federal court finds it "incorrect or erroneous" – instead, the federal court must find that the state court's application was

"objectively unreasonable." *Id*. (quoting *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003)). Review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011).

To grant relief under Section 2254(d)(2), a federal court must find that "the state court's factual determination was objectively unreasonable in light of the evidence presented in the state court proceedings." *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002) (cleaned up). State court factual determinations are only unreasonable "if it is shown that the state court's presumptively correct factual findings are rebutted by clear and convincing evidence and do not have support in the record." *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017) (quoting *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007)). "It is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was based on that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011) (citing *Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011)) (cleaned up). As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted) (cleaned up). "To provide the State with the necessary opportunity, the prisoner must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Id*.

(citation omitted) (cleaned up); *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996) (the substance of the claim must have been presented as a federal constitutional claim); *Wagner v. Smith*, 581 F.3d 410, 414, 417 (6th Cir. 2009). Accordingly, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *See Picard v. Connor*, 404 U.S. 270, 275 (1971); *see also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). In Tennessee, a petitioner is "deemed to have exhausted all available state remedies for [a] claim" when it is presented to the Tennessee Court of Criminal Appeals. *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39).

Claims that are not exhausted are procedurally defaulted and "ordinarily may not be considered by a federal court on habeas review." *Alley v. Bell*, 307 F.3d 380, 388 (6th Cir. 2002). "In order to gain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate cause and prejudice for the failure, or that a miscarriage of justice will result from the lack of review." *Id.* at 386. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman v. Thompson*, 501 U.S. 722, 754 (1991)).

A petitioner may establish cause by "show[ing] that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. *Id.* To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). "When a petitioner fails to establish cause to excuse a procedural default, a court

17

does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the Supreme Court also has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray*, 477 U.S. at 496).

With these principles in mind, the Court will turn to examination of the claims raised in the Second Amended Petition.

## VI. ANALYSIS

As candidly acknowledged by Petitioner in his reply, "the state has raised valid defenses to the vast majority of his claims because they were either procedurally defaulted or because he cannot overcome the hurdle of 28 U.S.C. § 2254(d) that would require him to prove the state court's adjudication of the issue unreasonable." *See* Reply (Docket Entry No. 118) at 21. Not surprisingly, Petitioner focuses his argument on his strongest two claims: (1) that his constitutional rights were violated because he was not appointed a language interpreter at this criminal trial (Claim 1), and (2) that his trial counsel bore responsibility for the lack of an interpreter to a degree that counsel can be said to have rendered constitutionally ineffective assistance of counsel (Claim 2, subparts 10-11).

Given the acknowledgment by Petitioner about the shortcoming of the majority of his claims, the Court only briefly addresses those claims. Petitioner's claims concerning the lack of an interpreter at trial, however, are not as readily resolved. Nonetheless, after review of the parties' arguments and the entire record in this case, the Court is convinced that habeas corpus relief is not

18

warranted based on Petitioner's claims that his constitutional rights were violated by the conduct of either the trial court or his trial counsel with respect to his need for an interpreter at trial.

A.  Petitioner's Conceded Claims

Subparts 1 and 8 of Petitioner's ineffective assistance of counsel claim (Claim 2)[5] were not raised in Petitioner's direct appeal or in any of his collateral relief proceedings and were therefore not exhausted by him prior to bringing them before this Court. Because these claims can no longer be pursued in the state court, they are deemed procedurally defaulted. Because Petitioner fails to set forth a basis to excuse the procedural default, the claims cannot support habeas corpus relief.

Subparts 2-7 of Petitioner's ineffective assistance of counsel claim (Claim 2)[6] were raised in Petitioner's post-conviction relief proceeding. *Song PCR Opinion* at *6-9. Because these claims were decided on the merits by the state court, habeas corpus relief can only be granted on the claims if the state court's findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law or if the state court's decision was based upon an unreasonable determination of the facts in light of the evidence presented to the state court. 28 U.S.C. § 2254(d)(1) & (2); *Williams*, 529 U.S. at 405. The burden is on Petitioner to show that these criteria have been met. Petitioner has not argued, let alone satisfied, this burden. Habeas relief is not warranted for these claims.

---

[5]  These subparts are that trial counsel that counsel (1) failed to adequately investigate the victim's family, and (8) failed to challenge count 10 for aggravated sexual battery as violative of double jeopardy. *See* Second Amended Petition at ¶¶ 36 and 44.

[6] These subparts are that trial counsel: (2) failed to investigate an alibi defense; (3) failed to properly request a jury regarding an alibi; (4) failed to object to hearsay and elicited hearsay testimony; (5) failed to advise and inform Petitioner of any plea offers and other matters; (6) failed to request a jury instruction "on child abuse as a lesser-included offense off child rape"; and, (7) failed to move sever the counts between the two victims. *See* Second Amended Petition at ¶¶ 37-42.

Subparts 9 and 12 of Plaintiff's ineffective assistance of counsel claim (Claim 2)[7] and Claim 3 – that the trial court wrongly enhanced his sentence – are barred by the one-year statute of limitations applicable to habeas corpus cases because they were not timely raised. 28 U.S.C. § 2244 (d)(1)(A)-(d)(1)(D). Petitioner's last state court proceeding finally concluded on October 19, 2011. *See* Docket Entry No. 27-25. However, these claims were not included as claims for relief in this federal habeas proceeding until they were raised in the first amended petition filed by Petitioner on February 26, 2013. *See* Docket Entry No. 43. As a result, they are untimely on their face and are barred from review. Petitioner provides no argument for why the claims should be viewed as timely, and under the law they are not. *See Mayle v. Felix*, 545 U.S. 644, 650, 664 (2005) (finding "[a]n amended habeas petition … does not relate back when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth"). Further, when distinct ineffective assistance of counsel claims are raised, the claims do not relate back to a prior petition simply because the Petitioner raised other ineffective assistance of counsel claims in the prior petition. *Watkins v. Deangelo-Kipp*, 854 F.3d 836, 848-51 (6th Cir. 2017); *Hill v. Mitchell*, 842 F.3d 910, 922–26 (6th Cir. 2016).

Claim 4, that the State failed to contact the Korean Consulate General in Atlanta, Georgia, upon the request of Petitioner in violation of Article 36(1)(b) of the Vienna Treaty, fails to present a cognizable claim for federal habeas corpus relief. *United States v. Emuegbunam*, 268 F.3d 377, 394 (6th Cir. 2001) ("[W]e hold that the Vienna Convention does not create a right for a detained foreign national to consult with the diplomatic representatives of his nation that the federal courts

---

[7] These subparts are (9) that trial counsel failed to move to quash Counts 1 through 7 on the grounds that the charges were identical, duplicitous, did not provide specific notice of the charges, and did not protect against double jeopardy, and (12) that both trial and appellate counsel failed to challenge Petitioner's sentence as being wrongfully enhanced. *See* Second Amended Petition at ¶¶ 44 and 47.

20

can enforce."). *See also Cauthern v. Bell*, 2010 WL 1408900, at *72 (M.D. Tenn. Mar. 31, 2010) (claims of violations of Article 36, even if not waived, would not support habeas corpus relief) (Trauger, J.), *aff'd in part, rev'd in part sub nom. Cauthern v. Colson*, 736 F.3d 465 (6th Cir. 2013).

Claims 5 and 6 – that the trial court erred by denying Petitioner's motion to compel production of the primary victim's interview tape and by allowing inappropriate questioning of Petitioner by the prosecutor – have been procedurally defaulted because the claims were raised in Petitioner's direct appeal as only issues of state law. *See Song Direct Appeal* at * 7-11. Consequently, the claims were not fully and fairly presented to the state court as alleged federal constitutional violations. Because Petitioner fails to set forth a basis to excuse the procedural default, these claims cannot support habeas corpus relief.

Claim 7 – that the trial court erred by denying Petitioner's motion for a new trial based upon newly discovered evidence – has also been procedurally defaulted because the claim was raised in Petitioner's direct appeal as only an issue of state law. *See Song Direct Appeal* at * 11-12. Because the claim was not fully and fairly presented to the state court as an alleged federal constitutional violation and because Petitioner fails to set forth a basis to excuse the procedural default, this claim cannot support habeas corpus relief.

B.  Denial of an Interpreter Claim (Claim 1)

Petitioner contends that the trial court's denial of his motion for an interpreter violated his due process rights and, specifically, his right to testify in his own words at trial so that he was heard in his own defense. *See* Second Amended Petition at 6-7; Reply at 21-23. Specifically, Petitioner asserts that, without the assistance of an interpreter, he was unable to understand substantial portions of his trial, struggled to understand questions posed to him on direct and cross-

examination, and gave testimony that was unintelligible, incoherent, and substantially less complete that what he could have offered in his native langue of Korean. *See* Amended Petition at 6-7, ¶ 34.[8] This claim has been properly exhausted because the substance of the claim was fully and fairly presented to the state court in Petitioner's direct appeal. *Song Direct Appeal* at *5-6.[9]

Respondent initially argues that this claim is not cognizable because the United States Supreme Court has never recognized a constitutional right to a court-appointed interpreter. *See* Answer at 6. The Court does not agree with this argument because the claim, even if it ultimately lacks merit, is a colorable claim that falls within the scope of habeas claims that are proper for review by the Court.

Nonetheless, the Court agrees with Respondent that the claim does not support habeas corpus relief. Because the claim was adjudicated on the merits by the state court, Plaintiff must meet the requirements set out in 28 U.S.C. § 2254(d) in order to be granted relief on the claim. Petitioner must show that the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States", 28 U.S.C. § 2254(d)(1); or (2) "based on an unreasonable determination of

---

[8] Although Petitioner also asserts in his petition that the lack of an interpreter impacted his ability to interact with his defense counsel regarding discussions and pre-trial preparation, these aspects are not argued by Petitioner in his reply, which focuses solely on the impact that the lack of an interpreter had at trial. Accordingly, the Court views Claim 1 as narrowed by Petitioner's reply.

[9] The Court notes that Petitioner's appellate brief contained no actual argument of the claim in terms of a federal constitutional violation, asserting only that Petitioner's "constitutional right to be heard" had been violated. *See* Appellant's Brief on direct appeal (Docket Entry No. 26-13) at 19-24. Because the "right to be heard" falls within the universally recognized rights protected by the Fifth, Sixth, and Fourteenth Amendments, *see Rock v. Arkansas*, 483 U.S. 44, 51-54 (1987), the Court views this claim has having been sufficiently raised as a violation of federal constitutional law and not merely as an error of state law.

the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2*);
Mammone v. Jenkins*, 49 F.4th 1026, 1041 (6th Cir. 2022)

The standard set forth in 28 U.S.C. § 2254(d) "is a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011), and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)) (cleaned up). This standard "was meant to be" a high hurdle for petitioners, consistent with the principle that habeas corpus functions as a guard against only "extreme malfunctions" in the state's administration of criminal justice. *Harrington*, 562 U.S. 86, 102 (2011). *See also Woods v. Donald*, 575 U.S. 312, 316 (2015). It has been described as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *White v. Wheeler*, 577 U.S. 73, 77 (2015) (quoting *Burt v. Titlow*, 571 U.S. 12, 19 (2013)).

Petitioner's difficulty in succeeding on this claim is that, while the general right of a criminal defendant to testify and be heard in his defense has long been established, *Rock v. Arkansas*, 483 U.S. 44, 51-54 (1987), the Supreme Court has not ruled on the specific issue raised by Petitioner and has yet to recognize a constitutionally protected right to a court-appointed interpreter. *See United States v. Si*, 333 F.3d 1041, 1043 n.3 (9th Cir. 2003); *United States v. Johnson*, 248 F.3d 655, 663 (7th Cir. 2001). The most relevant Supreme Court case on the issue is from the early 1900s when the Supreme Court briefly stated in *Perovich v. U.S.*, 205 U.S. 86 (1907), that:

> [o]ther matters referred to in the assignment of errors require but slight notice. One is that the court erred in refusing to appoint an interpreter when the defendant was testifying. This is a matter largely resting in the discretion of the trial court, and it does not appear from the answers made by the witness that there was any abuse of such discretion.

205 U.S. at 91. *See also United States v. Carrion*, 488 F.2d 12, 14 (1st Cir. 1973) (affirming that the decision on the need for an interpreter in a federal trial is within the wide discretion of the trial judge and that the trial judge did not abuse this discretion, nor violate Petitioner's constitutional rights, in light of a procedure being available for the defendant to request an interpreter, the trial judge's awareness of the language issue, the trial judge's questioning of defense counsel about the defendant's ability to communicate and understand English, and the trial judge's statement to the defendant to raise his hand if he did not understand any testimony).

Neither party argues that *Pervoich* constitutes clearly established law on this issue, and the Court agrees. Because there is no holding from the Supreme Court that clearly establishes the law on this issue for the purposes of section 2254(d)(1), the Court has no basis for finding that the state court's rejection of Petitioner's claim was contrary to or involved an unreasonable application of clearly established Supreme Court law under 28 U.S.C. § 2254(d)(1). *See Woods*, 575 U.S. at 317 ("Because none of our cases confront 'the specific question presented by this case,' the state court's decision could not be 'contrary to' any holding from this Court."); *Harrington*, 562 U.S. at 101 ("[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.") (citing *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)) (internal quotation marks omitted).

Petitioner argues that the state court's denial of the claim was an "unreasonable application" of *Rock*'s holding about the more general right to testify. This argument is unpersuasive and fails to support habeas corpus relief under section 2254(d). "[W]here the precise contours of a right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *Woods*, 575 U.S. at 318 (quotations and internal citations omitted). *See also Carrion*, 488 F.2d at 14. Similarly, Tennessee Rule of Criminal Procedure 28 specifically affords

to the trial judge the discretion to decide the issue of a criminal defendant's need for an interpreter. *See State v. Thien Duc Le*, 743 S.W.2d 199, 202 (Tenn. Crim. App. 1987).

The record supports the Tennessee Court of Criminal Appeals' findings that the trial judge did not abuse this discretion and did not commit error in denying Petitioner's motion for a court-appointed interpreter. The Tennessee Court of Criminal Appeals evaluated the information in the record to determine that the trial court had adhered to its duty to fairly evaluate the matter and to ensure that Petitioner's right to testify and be heard was not infringed upon by the lack of a court-appointed interpreter. Petitioner was given the opportunity to file a motion to request the appointment of an interpreter and the trial court held a hearing on the motion. Although trial counsel set out in his motion several reasons for why he perceived a need for Petitioner to have an interpreter at trial, he stated in his motion that Petitioner "speaks very good English" and that counsel is "able to communicate with" Petitioner." *See* Docket Entry 26-1. Further, the Tennessee Court of Criminal Appeals reviewed the trial court's pre-trial hearing on the motion, during which counsel again noted his concerns about Petitioner's testimony at trial but stated that "[Petitioner] speaks very good English, and I can sit down with him and understand him." *See Direct Appeal Opinion* at *6.

The state appellate court also reviewed the trial court's findings from the hearing on Petitioner's motion for a new trial and found as follows:

> the trial court, noting that it had "observed [the defendant] during the trial," found "there's absolutely no question in the [c]ourt's mind, as [defense counsel] indicated to the jury, that [the defendant] ... speaks very good English and understands English, and was able to respond to all the questions from the [d]efense attorney and the questions from the State in cross." Furthermore, the trial court found that the defendant was "attentive and interested, obviously, in what was being said and how the trial was proceeding." The defendant argues that he responded to some questions with "rambling lengthy answers." However, the trial court correctly noted that

it's not unusual for defendants, whether they're Korean-speaking or American-born, English-speaking citizens, to want to elaborate on their answers, maybe get far afield in their answers, in what is pertinent to a particular trial.

And, oftentimes, even those American-born, English-speaking witnesses have to be brought back, either with-from their attorney, as was done in this case several times, or from the State, in requesting that [the defendant] answer the question. And he did that.

The trial court, from its unique position of observing the defendant while he testified, concluded it saw "nothing that transpired during the trial that would lead [the trial court] to believe [the defendant] needed an interpreter.

*Id*. at *7. Finally, the Tennessee Court of Criminal Appeals independently reviewed the trial testimony and found that it revealed that Petitioner spoke English quite well and was able to effectively communicate to the jury, and that it did not preponderate against the finding of the trial court on the question of the need for an interpreter. The Court further notes that the trial transcript shows that the jurors were aware during Petitioner's testimony of the ability to raise their hands if they did not understand anything from Petitioner's testimony. *See* Trial Transcript (Docket Entry No. 26-11 at 6-7).

Considering the lack of clear authority from the Supreme Court on the issue and the evidence before the state court, this Court finds that that Petitioner has not met his burden of establishing that the state court's decision on the claim involved an unreasonable application of clearly established federal law or was based upon an unreasonable determination of the facts in light of the evidence presented. "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 787-

78. Petitioner has not met this rigorous threshold, and habeas corpus relief is not warranted on this claim.

## C. Ineffective Assistance of Counsel Claim (Claim 2, subparts 10-11)

Petitioner's final claim is that his trial counsel was constitutionally ineffective because counsel failed to adequately assess Petitioner's English proficiency before having Petitioner testify at trial without an interpreter, including by enlisting the help of the Korean Consulate. *See* Petitioner's Reply at 1.

Claims of ineffective assistance of counsel are subject to the two-prong standard of *Strickland v. Washington*, 466 U.S. 668 (1984), which asks: (1) whether counsel was deficient in representing Petitioner; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive Petitioner of a fair trial. *Id*. at 687. To meet the first prong, Petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness," and must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, [he] must overcome the presumption that ... the challenged action 'might be considered sound trial strategy.'" *Id*. at 688–89 (quoting *Michel v. State of La.*, 350 U.S. 91, 101 (1955)). The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). It requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

Respondent addresses this claim by viewing it as the same claim that was raised and denied on post-conviction review – that trial counsel failed to retain an interpreter despite Petitioner telling

him that he needed one and would pay for one. *See* Answer at 30-32. Along that line, Respondent analyzes the claim as an exhausted claim for which Petitioner cannot meet the standard for relief required by Section 2254(d). *Id*. However, Petitioner contends that the claim at issue is different than the claim of ineffective assistance of counsel related to an interpreter that was raised in his post-conviction relief proceeding, *see* Reply at 20-21, and candidly acknowledges that this claim has been procedurally defaulted because it was not raised and litigated in the post-conviction relief proceeding. *Id*. at 15.

The Court agrees with Petitioner as to the nature of the claim that he raises. It is a different claim of ineffective assistance of trial counsel than was raised in the post-conviction relief proceeding. The Court will therefore analyze the claim as presented by Petitioner in his reply. Because this claim was not adjudicated on the merits in the state court, the deferential standard of section 2254(d) does not apply. *Bies v. Sheldon*, 775 F.3d 386, 395 (6th Cir. 2014). However, a substantial hurdle still exists because, given the admitted procedural default of this claim, Petitioner must satisfy the cause and prejudice requirement before the claim can be considered by this Court. *Alley*, 307 F.3d at 388.

While ineffective assistance of post-conviction relief counsel does not generally constitute cause, petitioners in Tennessee can establish cause to excuse the procedural default of a substantial claim of ineffective assistance of trial counsel by demonstrating that the claim was not raised due to the ineffectiveness of post-conviction counsel. *See Martinez v. Ryan*, 566 U.S. 1, 5-6 (2012) (creating an exception where state law prohibits ineffective assistance of trial counsel claims on direct appeal). *See also Trevino v. Thaler*, 569 U.S. 413, 429 (2013) (extending *Martinez* to states with procedural frameworks that make meaningful opportunity to raise ineffective assistance of trial counsel claims on direct appeal unlikely); *Sutton v. Carpenter*, 745 F.3d 787, 792 (6th Cir.

2014) (holding that *Martinez* and *Trevino* apply in Tennessee). *Martinez* requires that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding," and that "the underlying ineffective-assistance-of trial counsel claim [be] a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Id*. at 13-15. Importantly, *Martinez* did not dispense with the actual prejudice prong of the standard for overcoming a procedural default first articulated by the Supreme Court in *Coleman*. *Jones v. Perry*, 2023 WL 1073151, at *8 (M.D. Tenn. Jan. 27, 2023).

Whether post-conviction counsel was constitutionally ineffective in failing to pursue a claim is necessarily connected to the strength of the claim, so "in many habeas cases seeking to overcome procedural default under *Martinez*, it will be more efficient for the reviewing court to consider in the first instance whether the alleged underlying ineffective assistance of counsel was substantial enough to satisfy the actual prejudice prong of *Coleman*." *Thorne v. Hollway*, 2014 WL 4411680, at *23 (M.D. Tenn. Sept. 8, 2014) (Trauger, J.), *aff'd sub nom. Thorne v. Lester*, 641 F. App'x 541 (6th Cir. 2016) (cleaned up). If the claim is not substantial, the reviewing court would have no need to consider whether the petitioner has established that his post-conviction counsel was ineffective for failing to pursue a claim. *Thorne*, 2014 WL 4411680 at *23. In demonstrating a substantial claim of ineffective assistance of trial counsel, the petitioner must prove prejudice under *Strickland*. *See McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 752 (6th Cir. 2013) ("To be successful under *Trevino*, [a petitioner] must show a 'substantial' claim of ineffective assistance, and this requirement applies as well to the prejudice portion of the ineffective assistance claim.") (internal citations omitted).

The Court finds that the procedural default of Petitioner's ineffective assistance of counsel claim should not be excused and that habeas corpus relief is not warranted because the claim is not

a substantial claim for which Petitioner can make a showing of actual prejudice arising from the defaulted claim. Given this failure, there is no need for the Court to address whether trial counsel or post-conviction relief counsel acted ineffectively. *Thorne*, 2014 WL 4411680, at *23.

The opinion from the Tennessee Court of Criminal Appeals directly addressed the issue of the impact of the lack of a court-appointed interpreter when it denied Petitioner's direct appeal. The state appellate court, after reviewing the trial record, clearly and unequivocally found that Petitioner spoke English quite well, that he was able to effectively communicate to the jury despite English not being his native language, and that nothing occurred during the course of the trial that indicated that an interpreter for Petitioner was necessary. Given these findings made by the state court, which are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1), the Court finds that Petitioner cannot show that he suffered actual prejudice arising from the failure of his trial counsel to secure an interpreter for him. Even though the state appellate court was not addressing a claim of ineffective assistance of counsel in its consideration of the claim of the denial of an interpreter, its analysis of the impact of the lack of an interpreter at Petitioner's trial nonetheless rings true and applies in the analysis of the procedurally defaulted ineffective assistance of counsel claim that is at issue. The state court's findings that the lack of an interpreter did not result in a consequential negative impact upon Petitioner's trial essentially foreclose any argument that trial counsel's failure to secure an interpreter, even if presumed to be ineffectiveness, rendered the results of Petitioner's trial unreliable or the trial proceedings fundamentally unfair. *Lockhart*, 506 U.S. at 372.

Petitioner seeks to show prejudice by pointing to examples from his trial testimony in which he faltered in his testimony or provided confusing or "incoherent" testimony. *See* Reply at 8-12. However, these examples are merely part of the overall trial testimony from Petitioner and

must be viewed in the context of the rest of his testimony, which indicates no difficulty in the use or understanding of the English language. Further, it is not remarkable that a criminal defendant who testified at trial and was convicted despite his testimony of innocence would be able to find portions of his testimony that he believes were damaging or confusing and that he would like to rephrase or redo. The Court finds that the examples pointed out by Petitioner are not "clear and convincing evidence" that is necessary to overcome the presumption of correctness afforded to the state court's findings that Petitioner was able to participate in his trial despite the language barrier and that an interpreter was not necessary for Petitioner to proceed at trial.[10]

Petitioner further attempts to buttress his prejudice argument by relying on the language skills report from Dr. Rhee that was created in 2015. *See* Reply at 12-14 and 19. However, consideration of this report is foreclosed by the Supreme Court's recent decision in *Shinn v. Ramirez*, __ U.S. __, 142 S. Ct. 1718 (2022). In no uncertain terms, the Supreme Court in *Shinn* declared that federal habeas review of procedurally defaulted claims is limited to the state-court record and should not involve consideration of new evidence unless the stringent requirements set out in 28 U.S.C. § 2254(e)(2) are satisfied. *Id*. at 1734 ("We now hold that, under § 2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel."); at

---

[10] The Court notes that the majority of the cases cited by Petitioner in his reply address the general issue of a criminal defendant's right to testify or the issue of ineffective assistance of counsel in cases that do not involve the need for an interpreter, and none of these cases involve the issue of prejudice arising from the lack of an interpreter at trial. The most relevant case cited by Petitioner, *United States v. Mayans*, 17 F.3d 1174 (9th Cir 1994), is not an ineffective assistance of counsel case, but involves an allegation of trial court error and facts showing that the trial court, during the testimony of the defendant, removed an interpreter that the defendant had been using and attempted to coerce the defendant to testify in English, resulting in the defendant's decision to forgo his right to testimony. *Mayans* is readily distinguishable from the facts of this case and fails to support Petitioner's claim.

1735 ( "In sum, under § 2254(e)(2), a prisoner is 'at fault' even when state postconviction counsel is negligent. In such a case, a federal court may order an evidentiary hearing or otherwise expand the state-court record only if the prisoner can satisfy § 2254(e)(2)'s stringent requirements."); and, at 1738 ("Therefore, when a federal habeas court convenes an evidentiary hearing for any purpose, or otherwise admits or reviews new evidence for any purpose, it may not consider that evidence on the merits of a negligent prisoner's defaulted claim unless the exceptions in § 2254(e)(2) are satisfied."). *See Houston v. Phillips*, 2022 WL 3371349, at *8 (6th Cir. Aug. 16, 2022) ("the equitable rule announced in *Martinez* does not give federal courts authority to amend AEDPA's statutory directives and allow petitioners to expand state-court records to support their ineffective-assistance-of-state-postconviction-counsel claims.").[11]

The Court recognizes that *Shinn* was not decided until after Petitioner had already obtained the language report, had entered it into the habeas record, and had relied upon it for his arguments. However, *Shinn* is now the controlling law on this issue. Given this circumstance, the Court independently considers whether section 2254(e)(2) could be met by Petitioner. Section 2254(e)(2) provides that:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>> (A) the claim relies on--
>>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

---

[11] Although the Court denied Petitioner's motion to hold an evidentiary hearing prior to *Shinn*, *see* Order entered September 27, 2018 (Docket Entry No. 122), *Shinn* would foreclose consideration of new evidence at an evidentiary hearing absent a showing that section 2254(e)(2) has been satisfied. 142 S.Ct. at 1735, 1739.

> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). The Court finds nothing in this case that would satisfy the requirements set out in section 2254(e)(2) to allow consideration of the report. This finding would likewise apply to the 2009 letter from the Korean Consulate, which Petitioner has also placed in the record.

Petitioner's counsel has done an admirable job of representing Petitioner in this case and has presented the Court with well-developed arguments. However, for the reasons set out herein, the petition for habeas corpus relief must be denied.

## RECOMMENDATION

Based on the foregoing, it is respectfully RECOMMENDED that the Petition for Habeas Corpus Relief be DENIED and this action be DISMISSED.

ANY OBJECTIONS to this Report and Recommendation must be filed within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of this Report and Recommendation to which objection is made. *See* Rule 72(b)(2) of the Federal Rules of Civil Procedure and Local Rule 72.02(a). Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Any response to the objections must be filed within fourteen (14) days after service of objections. *See* Federal Rule 72(b)(2) and Local Rule 72.02(b).

Respectfully submitted,

BARBARA D. HOLMES
United States Magistrate Judge